554 So.2d 99 (1989)
Danny Norman LITTON, et al., Plaintiffs/Appellees/Appellants,
v.
FORD MOTOR COMPANY and Liberty Mutual Insurance Company, Defendants/Appellants/Appellees.
No. 20892-CA.
Court of Appeal of Louisiana, Second Circuit.
December 6, 1989.
Rehearing Denied January 18, 1990.
*100 Tommy J. Johnson, Shreveport, for Danny Norman Litton, et al.
Mayer, Smith & Roberts by Paul R. Mayer, Sr., Shreveport, for Liberty Mut. Ins. Co. and Ford Motor Co.
McGrew and O'Neill by Keith Riddle, Baton Rouge, for Champion Ins. Co.
Rountree, Cox & Guin by Billy J. Guin, Jr., Shreveport, for Planet Ins. Co. and Mid South Fleet Leasing, A Perma Green Lawn of Jackson d/b/a Mid South Car and Truck Rental.
*101 Before HALL, C.J., and NORRIS and LINDSAY, JJ.
HALL, Chief Judge.
This suit arises out of an accident which occurred June 5, 1985 at the intersection of U.S. Highway 171 and La. Highway 5 in DeSoto Parish, known as the Kickapoo intersection. The intersection is controlled by a blinking yellow light on Highway 171 and a blinking red light and a stop sign on Highway 5. Cynthia Litton, accompanied by her 5 year old son Jason, was proceeding south on Highway 171. Margaret McMillan, accompanied by her sister Agnes McMillan, proceeding east on Highway 5, ran through the blinking red light and stop sign and her automobile was struck on the left side near the driver's door by the Litton automobile. Mrs. Litton was killed and her son was severely injured. The McMillan sisters were also killed. Margaret McMillan was driving a car owned by Ford Motor Company which her mother, also named Margaret McMillan, had leased from Mid South Car and Truck Rental, a licensee of Ford Motor Company in the Ford Rent-A-Car System.
This suit was brought by Mrs. Litton's husband and on behalf of her surviving children for damages arising out of her death, and to recover damages for the personal injuries sustained by Jason Litton. Named defendants were (1) the unopened succession of Margaret McMillan, (2) Mid South Fleet Leasing Corporation and its subsidiary corporation, A Perma Green Lawn of Jackson, Inc. d/b/a Mid South Car and Truck Rental, (3) Ford Motor Company, (4) Liberty Mutual Insurance Company which had issued a liability insurance policy to Ford Motor Company with $100,000/$300,000 limits covering the leased automobile, (5) Planet Insurance Company which had issued a liability policy to A Perma Green Lawn, with limits of $100,000/$300,000 covering the leased automobile, and (6) Champion Insurance Company which had issued a liability policy with $10,000/$20,000 uninsured motorist coverage covering the Litton vehicle. Ford Motor Company was alleged to be liable to plaintiffs under an agreement between Ford and its licensee whereby Ford agreed to provide excess liability coverage of $1,000,000 over and above the basic $100,000/$300,000 coverage provided by Liberty Mutual, protecting not only Ford and its licensee but also the daily rental customer.
Defendants denied liability and pled Mrs. Litton's contributory or comparative negligence. Ford contended that its agreement with its licensee had been amended to eliminate the $1,000,000 excess coverage for rental customers and, even if the agreement continued in effect, plaintiffs were not third party beneficiaries of that agreement and had no right to recover from Ford.
After trial the district court found that the sole cause of the accident was the negligence of Ms. McMillan, that A Perma Green Lawn and Mid South were not negligent and not liable, and that the Ford Motor Company excess coverage agreement was in effect and extended coverage to the plaintiffs. Judgment was rendered in favor of Mr. Litton for $8,531.44 in special damages and $250,000 in general damages. Jason Litton was awarded damages of $1,000,000 which included $150,000 for the loss of his mother and $850,000 for his personal injuries. The other two children of Cynthia Litton were awarded $150,000 each. The total amount of damages awarded was $1,558,531.44. The liability of the insurance companies was limited to their policy limits. Ford was cast for $1,000,000 over and above the amounts due by the insurance companies. Plaintiffs' suit was dismissed against A Perma Green Lawn and Mid South.
Ford and Liberty Mutual appealed suspensively asserting four specifications of error and filing an exception of no right of action in this court. Plaintiffs appealed asserting four specifications of error. Neither Planet Insurance Company nor Champion Insurance Company appealed, therefore, the judgment against them is final. Finding no error in the trial court's judgment, we affirm.
As set forth by the defendants-appellants, their four specifications of error raise the following issues:

*102 1. Do these plaintiffs have a right to seek to enforce the promise by Ford to Bill Hanna Ford to furnish excess coverage on the rent cars in favor of the rentees thereof as contained in the contract of January 2, 1968? In other words, are they third party beneficiaries, as they claim, which Ford denies?
2. If the court concludes that plaintiffs are third party beneficiaries, then the issue is whether or not the Ford Rent-A-Car contract with Bill Hanna Ford was effectively modified so as to eliminate excess coverage before the occurrence of this accident. Ford claims that it was and plaintiffs claim that it was not.
3. Was Mrs. Litton guilty of contributory negligence so as to require the application of the Louisiana Comparative Negligence Statute to any awards to the plaintiffs? Ford and Liberty Mutual as the primary ($100,000/$300,000) carrier on the rent car claims that she was and plaintiffs claim that she was not.
4. Is the award of $850,000.00 to Jason Litton for general damages excessive in light of the evidence introduced on his behalf? Ford and Liberty Mutual claim that they are excessive.
The plaintiffs' assignments of error are:
1. Plaintiffs assert that the trial court erred in failing to award Danny Norman Litton loss of support and loss of homemaker services as a result of the death of Cynthia Litton.
2. Plaintiffs assert that the trial court erred in admitting into evidence the depositions of William R. McCreedy, W.H. Barksdale and Arthur S. Carlson, identified as Ford 18, 19 and 20, and bulletins and attachments identified in said depositions in that said depositions were taken for the purpose of discovery and furthermore, on June 9, 1988, plaintiffs filed Written Objections to Questions Posed as to each deposition and the attachments thereto and said objections are valid.
3. Plaintiffs assert that the appeal lodged by LIBERTY MUTUAL INSURANCE COMPANY in this instance was a frivolous appeal and plaintiffs are entitled to damages and attorney's fees.
4. Plaintiffs assert that they are entitled to interest on the entire balance of the judgment since the date of the signing of the judgment.

DEFENDANTS' ISSUE NO. 1

RECOVERY UNDER FORD'S AGREEMENT WITH ITS LICENSEE
In 1964 and again in 1968 Ford Motor Company (Ford) and Bill Hanna Ford (Hanna) entered into contracts entitled Ford Rent-A-Car System Agreement and Lease Agreement which provided that Hanna would purchase or lease cars from Ford for lease to various individuals. These contracts were later amended to substitute Mid-South and then A Perma Green Lawn, a Hanna subsidiary, as licensee. One of these contracts contained a provision stating that Ford would provide basic liability insurance on cars to be leased through Hanna with $100,000/$300,000 limits. In addition, Ford agreed to provide excess liability coverage of $1,000,000 to protect "the company, licensee, any other person having an interest in the vehicle if he so desires, and any person 21 years of age or older driving the vehicle with valid permission." Appellant Ford asserts this language may not serve as the basis for a stipulation pour autrui in favor of the plaintiffs and that plaintiffs as strangers to the contract have no right of recovery against Ford under its contracted agreement with its licensee.
Ford's agreement was to provide an additional $1,000,000 liability insurance to protect, in addition to Ford and its licensee, the rental customer and driver of the rental car. This obligation could be met by purchasing a policy of liability insurance from an insurance company or on a "self-insured" basis. It is not clear from the record whether Ford ever obtained a liability insurance policy providing excess coverage for the rental customer, but at the time of the accident a $5,000,000 excess policy issued by Liberty Mutual provided coverage only to Ford and the licensee, and not the rental customer or driver. The rental customer and driver were third party beneficiaries of the agreement between Ford *103 and the licensee, that is, Ford was obligated to the customer and driver to provide the additional $1,000,000 liability coverage. C.C. Art. 1978, Tapia v. Ham, 480 So.2d 855 (La.App. 2d Cir.1985), writ denied 484 So.2d 138 (La.1986). Under the well-established jurisprudence, the general public as a class is also a third party beneficiary of liability insurance coverage. This is true whether the coverage is provided through a policy of insurance or on a self-insured basis. See Ashline v. Simon, 466 So.2d 622 (La.App. 5th Cir.1985), writ denied 472 So.2d 28 (La.1985), where Hertz Corporation as a self-insurer under its agreement to provide coverage to the rental customer was held to provide insurance coverage on the same basis as any automobile liability policy. Thus, Ford as the provider of liability coverage to the customer and driver, McMillan, is liable to the plaintiffs who were injured as the result of the negligence of the party to whom liability coverage was provided by Ford. It follows that plaintiff had a direct right of action against Ford. See Boudreaux v. ABC Insurance Co., 689 F.2d 1256 (5th Cir.1982).
The Tapia case, supra, decided by this court, is strongly supportive of the plaintiffs' position. The rental car in that case was rented from a Ford licensee who had an identical agreement with Ford in which Ford agreed to provide $1,000,000 additional liability insurance coverage covering the daily rental customer. Ford apparently did not urge that the contract had been amended to eliminate the excess coverage. The record did not reflect that Ford had obtained a liability insurance policy. This court held that the lessee and the passenger in the car would have been third party beneficiaries of any excess liability policy Ford might have purchased to fulfill its obligation. Although Ford had not purchased a policy, it could not escape its express obligation to provide $1,000,000 excess liability coverage that would protect one who leases a car from its licensee. The customer and the passenger were entitled to recover their respective damages against Ford under the statutorily required UM coverage ancillary to liability coverage.
Ford relies on Campbell v. Continental Emsco Co., 445 So.2d 70 (La.App. 2d Cir. 1984), writ denied 446 So.2d 1223 (La.1984); LeBouef v. Colony Insurance Company, 486 So.2d 760 (La.App. 1st Cir.1985); and Oliver v. Natchitoches Air Center, 506 So.2d 558 (La.App. 3d Cir.1987), writ denied 507 So.2d 220 (La.1987). The Campbell line of cases relied on by Ford are not apposite. These were actions against insurance agents who had failed to obtain liability insurance policies for their clients. It was held that parties injured by the clients could not recover directly from the insurance agents. There is a distinct difference between the obligation of an insurance agent to procure an insurance policy for a client and the obligation undertaken by Ford here to provide liability insurance coverage not only to its licensee but also to the daily rental customers. An agent does not agree to provide coverage, but only agrees to provide the service of obtaining a policy from an insurance company. Here, Ford agreed to provide the coverage. The fact that it did not obtain an insurance policy as one means of compliance with this obligation is of no consequence.

DEFENDANTS' ISSUE NO. 2:

REVOCATION OF AGREEMENT
Defendant Ford Motor Company also asserts that if the provision in the 1968 Ford Rent-A-Car System agreement originally provided a stipulation pour autrui, this stipulation was validly revoked prior to the accident in question. This argument is based upon a second provision in the Ford Rent-A-Car System standard provisions incorporated into the Ford Rent-A-Car System agreement. Article X of the standard provisions provides "1. Changes in Ford Rent-A-Car System. The Company reserves and shall have the right, at any time and from time to time, to discontinue or change in its sole discretion, any part or parts or all the Ford Rent-A-Car System, including, without limitation, any documents, procedures, forms, advertising promotions, trade-marks, service-marks, trade-names, symbols, slogans and devices, and the Ford Rent-A-Car System as so *104 changed at any time shall be deemed to be the Ford Rent-A-Car system referred to in this agreement...."
The agreement also provides:
3. Notices. Any notice required or permitted by this agreement, or given in connection herewith, shall be in writing and may be by personal delivery or by first-class registered or certified mail, postage prepaid. Notices to the Company shall be delivered or mailed to the Ford Division District Sales Manager of the Company of the area in which the Licensee's place of business is located. Notices to the Licensee shall be delivered or mailed to any person designated in paragraph B hereof as having managerial authority or delivered or mailed to the Licensee at his place of business above stated. Notices given by mail shall be deemed given when deposited in any letter box maintained for that purpose by the U.S. Postal Department.
Defendants assert that Article X provides the mechanism by which Ford was enabled to unilaterally change the insurance provided in the Ford Rent-A-Car system standard provisions. Ford asserts further that this was done through bulletins issued from the Ford headquarters to the various participants in the Ford Rent-A-Car system. Bulletin no. 731 issued to all licensees of the Ford Rent-A-Car system purported to amend the contract to exclude the excess liability coverage benefit to the daily rental customer.
On the other hand, plaintiffs argue that the agreement could be amended to revoke the excess coverage provision only by compliance with Paragraph E of the agreement which provides:
"E. The Licensee acknowledges notice that ... (ii) no one except the Vice President and General Manager or the General Sales Manager of the Ford division of the Company or the Secretary or an Assistant Secretary of the Company is authorized to make or execute any other agreement relating to the subject matter hereof on behalf of the company or in any manner to enlarge, vary, or modify the terms of this agreement and they only by an instrument in writing,...."
It is argued that no instrument in writing amending the agreement to exclude the excess coverage was ever executed by an appropriate authorized officer of Ford, and the unilateral unsigned bulletins were ineffective to revoke the obligation to provide such coverage.
In construing the provisions of this contract we are required to follow the civil code articles relating to interpretation of contracts. Three code articles are particularly helpful in this case. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties intent. LSA-C.C. Art. 2046. A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective. LSA-C.C. Art. 2049. Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. LSA-C.C. Art. 2050.
In this case there is an apparent conflict between two provisions of the contract. Paragraph E of the Ford Rent-A-Car System Agreement seems to require the signature of an authorized signator to vary any of the terms of the system agreement. However, Article X of the standard provisions seems to allow Ford to unilaterally change any provision at any time by simply posting to the individual franchisees notices setting forth the changes in the agreement. Interpreting these two provisions together, we find that Ford could change the system agreement at any time provided such modification or change is effected by an instrument in writing signed by one of the signators named in paragraph E.
This interpretation is supported by the assignment of the Ford Rent-A-Car System Agreement and Lease Agreement found in the record which was signed by the assistant secretary of Ford. This interpretation is further supported by the deposition of William R. McCreedy who, when asked who signed the amendments to the *105 contracts, stated: "A dealer would have to sign or an authorized signator for the dealership, but who has the authority to sign them for us I can't honestly say."
In the case at bar the purported amendment to the Ford Rent-A-Car System Agreement eliminating the $1,000,000 excess coverage was announced to the dealerships through the use of bulletin 731, however, there was no signed instrument in writing which validly revoked the excess coverage, a substantive provision of the agreement. Therefore, the trial court was correct in determining that Ford was obligated to provide $1,000,000 in excess coverage for rental customers and authorized drivers.

DEFENDANTS' ISSUE NO. 3:

COMPARATIVE FAULT
Appellants Ford and Liberty Mutual also assert the trial court erred in determining that Margaret McMillan was solely at fault for causing the accident. Appellants assert that Cynthia Litton was at least partially at fault for her failure to observe the McMillan vehicle and to approach the intersection with caution.
On appeal we are required to give great weight to the factual conclusions of the trial court where they are based on reasonable evaluations of credibility and reasonable inferences of fact. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); In the Matter of Fox, 504 So.2d 101 (La.App. 2d Cir.1987), writ denied 504 So.2d 556 (1987).
In this case the trial court heard the testimony of two eyewitnesses which indicated that the Litton vehicle was traveling in the outside lane of the favored highway within the speed limit and that the McMillan vehicle failed to stop at the stop sign and blinking red light. The trial court further had before it testimony concerning the damage to the various vehicles and photographs of the accident scene. Most importantly, one eyewitness testified that the McMillan car was slowing down as it approached the intersection and looked like it was going to stop. The witness was "pretty sure it was going to stop." The testimony of another eye witness indicated Mrs. Litton had no time to stop or take evasive action when the McMillan car failed to stop and proceeded into the intersection. With the McMillan car slowing and appearing to be stopping at the intersection, Mrs. Litton was entitled to assume the car would stop and she was entitled to proceed on through the intersection at a normal speed. The evidence does not establish that she failed to exercise due caution or that she could have taken evasive action after the McMillan car failed to stop. The trial court did not err in finding Mrs. Litton free from negligence.
The defendants refer us to LSA-R.S. 32:234 which provides:
"When a yellow light is illuminated with rapid intermittent flashes, drivers of vehicles may proceed through or past such signal only with caution."
Defendants also cite Salles v. State Farm Mutual Auto. Ins. Co., 395 So.2d 942 (La. App. 2d Cir.1981), writ denied 400 So.2d 903 (La.1981) where we held:
"While a driver approaching a flashing yellow light may ordinarily rely on the fact that a driver approaching a flashing red light would stop before entering the intersection as required by law, the driver approaching a yellow light is under a duty to exercise caution and vigilance so that he may ascertain whether he can cross with safety. Greater American Ins. Co. v. Turnage, [339 So.2d 1322 (La.App. 1st Cir.1976)] supra; State Farm Mutual Automobile Ins. Co. v. Merritt, 185 So.2d 832 (La.App. 3d Cir. 1966); Liberty Mutual Insurance Company v. Wilson, 282 So.2d 745 (La.App. 1st Cir.1973)."
In the Salles case we held that a driver in the favored lane of travel approaching a blind or obstructed intersection, faced with a flashing caution light was contributorily negligent. Salles is factually distinguishable from the instant case which is more similar to Haire v. Allstate Insurance Company, 224 So.2d 531 (La.App. 2d Cir. 1969), writ refused 226 So.2d 770 (La.1969) and McMillan v. State Farm Mutual Auto Ins. Co., 356 So.2d 1368 (La.1978). In *106 those cases the motorists approaching the yellow blinking lights were held to be free from negligence where there were no obstructions to vision and the motorists approaching the blinking red light and stop sign slowed as though to stop.
The trial court did not err in determining that Mrs. Litton was free from fault.

DEFENDANTS' ISSUE NO. 4:

AWARD TO JASON LITTON
Appellants Ford and Liberty Mutual assert that the award of $850,000 to Jason Litton for his personal injuries is excessive.
Before an appellate court can disturb a quantum award, the record must clearly reveal that the trier of fact abused its discretion. To make this determination we look first, not to prior awards, but to the individual circumstances of the injured plaintiff. Only after analysis of the facts and circumstances peculiar to this case and this individual may we conclude that the award is excessive. See Reck v. Stevens, 373 So.2d 498 (La.1979); Cariere v. State Farm Insurance Company, 467 So.2d 867 (La.App. 2d Cir.1985). Prior awards under similar circumstances serve only as a general guide. In such review, we determine whether the present award is greatly disproportionate to the mass of past awards for truly similar injuries. See Reck v. Stevens, supra; Wactor v. Pickens Lumber Co., 505 So.2d 815 (La.App. 2d Cir.1987), writ denied 508 So.2d 827 (La.1987).
Appellants assert that as the medical testimony shows that Jason Litton suffers a 50% disability of his shoulder, the evaluation by Drs. Galloway and Harju indicating that Jason has no use of his left arm is in error.
Dr. Millstead, the orthopedic surgeon, described the injury to Jason's shoulder as a brachial plexus traction injury with a pre-ganglionic injury which is not amenable to surgery and is permanent. He testified that Jason has 50% disability of his shoulder, or upper left extremity. However, he explained that this 50% medical evaluation of the disability did not equate to a 50% physical disability. He also testified that Jason would not be able to effectively use his left arm. The arm will permanently hang by the child's side, and will have to be placed in position before the child is able to use any of the muscles in his lower arm or hand. Once placed in position the arm cannot be moved other than by picking it up with the other hand.
Dr. Galloway, the rehabilitation expert, testified that without the use of the left arm Jason's occupational opportunities would be limited. Before the injury Jason would probably have been able to perform 39.44% of the jobs available in the country whereas after the accident Jason would be limited to 5% of the jobs available in the entire country. This evaluation was arrived at using various factors, including Jason's personal and family background as well as various test scores. He projected Jason's average weekly earnings anticipated prior to the accident as $622, whereas after the accident Jason would be limited to an earnings capability of approximately $318 a week, a diminution of $304. Dr. Harju, using the information provided by Dr. Galloway, calculated Jason's lost earning capacity as having a present value of $438,170.
Defendant offered no expert testimony to refute the testimony of plaintiff's experts. The trial court, which did not itemize the $850,000 award for Jason's damages, could reasonably have accepted the $438,170 figure for loss of future earnings. This would put the general damage award at $411,830.
Appellants call our attention to Bourgeois v. Jones, 481 So.2d 145 (La.App. 5th Cir.1985), writ denied 484 So.2d 136 (La. 1986) to support their position that the $850,000 compensation to Jason Litton for the injuries he sustained in the accident is excessive. In Bourgeois the plaintiff, a married woman, was awarded $228,000 to compensate her for several injuries, including $60,000 for a shoulder injury which may or may not have been similar to that of Jason Litton.
We find a more appropriate parallel in Turner v. State Department of Transportation *107 and Development, 509 So.2d 489 (La.App. 3rd Cir.1987), writ denied 510 So.2d 377 (La.1987). Turner involved a three and one-half year old boy who was injured permanently in an automobile accident. The trial court carefully considered the child's injuries at the time of the accident, his treatment after the accident, the extent of permanent disability, the evaluation of the child's I.Q., and the disfigurement as a result of the injury. The child was awarded over $450,000, itemized as $250,000 in general damages and $235,776 for loss of future income and earning capacity.
The child's injuries in Turner were substantially more serious than were Jason's, consisting of a disfigured right side, an abnormal right hand, abnormal right leg and foot, and bladder problems. He underwent surgery, was paralyzed for six months, and was still under treatment at time of trial.
In the case at bar, Jason Litton will suffer disfigurement according to the testimony of Dr. Millstead, through the withering of his left arm as well as the hunchback effect resulting from deterioration of the shoulder muscle. This disfigurement will be permanent as will the loss of use of the left arm. There was evidence in the record that the child had previously had an active childhood and will be unable to enjoy the same activities in the future. He suffers from embarrassment and has withdrawn from activities with other children.
Jason's injuries and permanent disability are serious and merit a substantial award. We determine, however, that the award for general damage in excess of $400,000 is excessive and an abuse of discretion. We reduce the award of general damages by $100,000 reducing the total award to $750,000, the amount we consider to be the maximum in the range of discretion.

PLAINTIFFS' SPECIFICATION OF ERROR NO. 1:

DANNY LITTON'S DAMAGES
Plaintiffs assert that the award of $250,000 to Danny Litton for the loss of Cynthia Litton should be increased to award compensation for the loss of future support and homemaker services that would have been rendered by Cynthia Litton. Dr. Harju estimated the total value of these items at $474,496. Mrs. Litton was not working at the time of the accident but had worked in the past and may have been planning to return to work. A lump sum judgment of damages is normally presumed to award all the items of damages claimed and proven. Aucoin v. Hartford Accident and Indemnity Co., 499 So.2d 1042 (La.App. 3d Cir.1986); Dunaway v. Rester Refrigeration Services, Inc., 428 So.2d 1064 (La.App. 1st Cir.1983), writ denied 433 So.2d 1056, 1057 (La.1983).
The trial court apparently discounted to a substantial extent the economic loss attributable to Mrs. Litton's death, but it undoubtedly was considered in the lump sum award. We find no abuse of discretion in the total award of $250,000 to Mr. Litton.

PLAINTIFFS' SPECIFICATION OF ERROR NO. 2:

ADMISSIBILITY OF DEPOSITIONS
As we affirm the trial court's judgment on liability of Ford, it is not necessary for us to consider the plaintiffs' specification of error relating to the admissibility of the depositions of Ford employees.

PLAINTIFFS' SPECIFICATION OF ERROR NO. 3:

FRIVOLOUS APPEAL
Ford's appeal is certainly not frivolous, raising serious contested issues affecting both liability of Ford and quantum. While Liberty Mutual's interest would seem to be limited to contributory negligence of Mrs. Litton as it bears on quantum, and even if recovery were reduced because of her comparative negligence damages would likely exceed its policy limits, the appeal does not appear entirely frivolous. Damages for frivolous appeal will be denied.

PLAINTIFFS' SPECIFICATION OF ERROR NO. 4:

LEGAL INTEREST
Plaintiffs contend Liberty Mutual and Ford should be cast for legal interest *108 beyond the limits of Liberty Mutual's policy and Ford's Agreement to provide coverage.
Since there was no judgment against the insured, the unopened succession of Margaret McMillan, the reason for imposing liability beyond policy limits to protect the insured from paying legal interest does not exist in this case. Plaintiffs do not refer to any provision of the Liberty Mutual policy or the Ford agreement that obligates either to payments beyond the stated limits of liability. We perceive no error in the judgment in this regard.

DECREE
The judgment of the district court is amended to reduce the amount awarded to Danny Norman Litton as tutor of the minor child Jason Nicholas Litton for damages to Jason Nicholas Litton from $850,000 to $750,000. Otherwise the judgment is affirmed. Costs of the appeal are assessed to appellants Ford Motor Company and Liberty Mutual Insurance Company.
Amended and, as amended, affirmed.

ON APPLICATION FOR REHEARING
Before HALL, NORRIS, LINDSAY, MARVIN, and HIGHTOWER, JJ.
Rehearing denied.